UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ABENA MORLE, KYMANI DUVERNEY, NAHSHON WEBB, AFIYA WEBB, Individually and as Parent and Natural Guardian of A.S., an Infant Under the Age of Fourteen Years, Plaintiffs, -against- DETECTIVE SHAWN HAYES, Shield No. 6093, and P.O. "JOHN DOES" 1–12, Defendants. | : | **OPINION & ORDER** 20-cv-103 (DLI)(MMH) |

**DORA L. IRIZARRY, United States District Judge:**

On January 6, 2020, Abena Morle, Kymani Duverney, Nahshon Webb, Afiya Webb individually and as a parent and natural guardian of minor A.S., (collectively, "Plaintiffs") filed this action against Detective Shawn Hayes, Shield No. 6903 ("Det. Hayes"), and P.O. "John Does" 1–12 (collectively, "Defendants") alleging several constitutional violations pursuant to 42 U.S.C. § 1983 ("1983"). *See*, Compl., Dkt. Entry No. 1. Defendants moved for summary judgment, which Plaintiffs opposed. *See*, Defendants' Mot. for Summ. J. and Mem. in Supp. (collectively, "Mot."), Dkt. Entry Nos. 70, 73; Plaintiffs' Mem. in Opp'n ("Opp'n"), Dkt. Entry No. 78; Defendants' Rule 56.1 Statement ("Defs.' 56.1"), Dkt. Entry No. 72; Plaintiffs' Rule 56.1 Statement ("Pls.' Counterstatement"), Dkt. Entry No. 76. Defendants replied to the Opposition and Plaintiffs' Rule 56.1 Counterstatement. Reply, Dkt. Entry No. 85; Defendants' Resp. to Plaintiffs' Counterstatement ("Defs.' Counterstatement Resp."), Dkt. Entry No. 83. For the reasons set forth below, Defendants' motion for summary judgment is granted in its entirety.

## BACKGROUND

### I. Local Civil Rule 56.1 – Facts and Evidence Considered

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 56.1") requires that a party moving for summary judgment submit "a separate, short and concise statement, in numbered paragraphs" setting forth material facts as to which there is no genuine issue to be tried. *See*, Local Civ. R. 56.1(a). A party opposing a motion for summary judgment shall submit papers that include "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *See*, Local Civ. R. 56.1(b). The facts set forth in the moving party's Rule 56.1 statement will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph" in the opposing party's Rule 56.1 counterstatement. *See*, Local Civ. R. 56.1(c); *See also*, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 72 (2d Cir. 2001). The refusal or inability to admit or dispute a statement does not satisfy the rule's requirement to controvert that statement specifically. *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp.2d 233, 248 (S.D.N.Y. 2014).

#### A. Defendants' Rule 56.1 Statement

Defendants' Rule 56.1 Statement consists of thirty-five paragraphs. Defs.' 56.1. Plaintiffs deny or object to fourteen of the paragraphs and provide twenty-nine paragraphs of facts. Pls.' Counterstatement. Defendants deny or object to sixteen of Plaintiffs' paragraphs, and partially admit to others. *See*, Defs.' Counterstatement Resp. Each statement by the movant, or statement denying a material fact by the nonmovant, must be followed by citation to admissible evidence. *See*, Local Civ. R. 56.1(d). Pls.' Counterstatement does not cite to admissible evidence when denying paragraphs 8 and 22–24. *See*, Pls.' Counterstatement. Thus, uncontroverted paragraphs

in Defs.' 56.1 include: 2–5, 8–15, 17 (partially), 18 (partially), 19, 20, 22–25, 27 (partially), 28, 30, and 34–35. Uncontroverted paragraphs in Pls.' Counterstatement include: 36, 40–41, 44 (partially), 46, 53–58, 60, 62 (partially), 63 (partially), and 64 (partially).

## II. Factual Background

In reviewing a motion for summary judgment, the Court considers only those facts that have been established by admissible evidence and disregards conclusory allegations and legal arguments contained in the Rule 56.1 statements. *See*, *Holtz*, 258 F.3d at 73. The Court exercises its discretion to "conduct an assiduous review of the record" in order "to consider what the parties [have] fail[ed] to point out in their Local Rule 56.1 Statements." *Id.* (internal quotation marks and citation omitted). Disagreements as to material facts are viewed in the light most favorable to the non-movant.

Plaintiffs lived together at 17-15 Redfern Avenue, Far Rockaway, Queens, New York, which consisted of a multi-story "main house" and "detached garage," or two little "bungalows."[1] Dep. of Nahshon Webb, Ex. A ("Ex. A"), Dkt. Entry No. 71–1 at 22:9; 23:11–13. A "rotation of people" lived in or used the bungalows. *Id*. at 24:7–18. Det. Hayes was assigned to Queens South Narcotics of the New York City Police Department and was investigating 17-15 Redfern Avenue for suspected criminal activity. Dep. of Det. Hayes, Ex. B ("Ex. B"), Dkt. Entry No. 80–1 at 13:7–8; 18:19–21. During the investigation, his team conducted three "controlled buys" of narcotics with a confidential informant ("CI") at the address. *Id*. at 20:2–6. Following the first two controlled buys, the non-party officers who had been present for the buys informed Det. Hayes as to what had transpired, because he had not been present. *Id*. at 33:19–34:2. Det. Hayes was present for the last controlled buy. *Id*. at 24:5–28:23.

[1] Throughout Det. Hayes' deposition, he refers to the bungalows as a detached garage and Plaintiffs refer to them as bungalows. Admissible evidence establishes that a detached garage of the main house was converted into two bungalows that were rented out or used by different people. The "detached garage" or "bungalows" refer to the same structure.

At the last controlled buy, the CI met an individual identified only as "JD Moosa," ("John Doe") and bought four loose crack cocaine ("crack") rocks. *Id.* at 29:10–14; 31:15–32:2. The CI went through the yard to the two bungalows in the back of the main house to meet JD Moosa. CI Dep., Ex. 1 ("Ex. 1"), Dkt. Entry No. 75 at 24:3–21. JD Moosa entered the "house" to get the drugs, while the CI "waited in the detached garage." *Id.* at 30:17–31:9. The CI described the location where they waited as a "little area" between the screen door and another door to go into the bungalow and the "house" as the bungalow apartments. *Id.* at 29:5–13. Following the buy, the CI met with officers, including Det. Hayes, and informed them that JD Moosa grabbed the crack rocks from the "house," which Det. Hayes understood to be the main house, but actually was one of the bungalows. Ex. B at 32:3–9; 34:8–16; *See also*, Pls.' Counterstatement ¶ 9. In addition, the other officers at the earlier controlled buys told Det. Hayes that JD Moosa had met the CI at the main structure and had instructed them to "go to the back to the second structure," where the purchase took place. *Id.* at 35:5–23.

On August 1, 2017, Det. Hayes applied for and obtained a search warrant for the main house. *Id.* at 59:3–6. Another non-party officer applied for and obtained a search warrant for the "detached garage" or bungalows the same day. *Id.* at 50:6–22. The search warrants were executed on August 4, 2017. *Id.* at 52:22–23. When executing the warrants, the first set of officers arrived in unmarked cars dressed in riot gear with weapons. Ex. A at 46:5–22; 47:15–22. Plaintiffs could not see the officers' faces. *Id.* at 48:7–9. The officers split into two teams: one group went to the main house and another group went to the bungalows. *Id.* at 48:17–22. One officer spoke with Nahshon Webb and pulled him over to the side while other officers in the main house group entered the home. *Id.* at 53:11–21. The officers who entered the house announced their presence and one of them flung Kymani Duverney to the ground and handcuffed him. Kymani Duverney Dep., Ex. F ("Ex. F"), Dkt. Entry No. 71–5 at 47:1–21. After Abena Morle was handcuffed and seated on

the couch, Afiya Webb and A.S. were told to go downstairs and sit on the couch, which they did. Abena Morle Dep., Ex. C ("Ex. C"), Dkt. Entry No. 71–2 at 77:24–78:14; Afiya Webb Dep., Ex. G ("Ex. G"), Dkt. Entry No. 71–6 at 52:20–53:22. Abena Morle told the officers that they "were in the wrong house." Ex. C at 47:7–9. The officers detained Plaintiffs for over two hours as they conducted the search. *Id*. at 79:4–14.

Det. Hayes was part of the team that first searched the detached garage or bungalows. Ex. B at 61:11–14. Det. Hayes recovered narcotics and drug paraphernalia from inside the bungalows. *Id*. at 64:20–23. After searching the bungalows, Det. Hayes moved to the first floor of the main house and informed the Plaintiffs being held there that the officers were executing a search warrant. *Id*. at 65:6–9; 68:16–21. While searching the second floor, a non-party officer informed Det. Hayes that an oxycodone pill was on the floor next to a bed. *Id*. at 70:19–71:11. Det. Hayes recovered the pill and asked Plaintiffs whose bedroom that was. *Id*. 72:6–12. Nahshon Webb informed Det. Hayes that it was his bedroom, but earlier had informed another officer that the room was "his mom's bedroom where we all sleep." *Id*. at 72:13–15; Ex. A at 56:15–24. Officers arrested Nahshon Webb for possession of the oxycodone pill because he stated it was his but could not produce a prescription for it. *Id*. at 73:2–16. Det. Hayes also recovered Tramadol, arrested Kwasi Morle, and arrested three non-party individuals in the bungalows. *Id*. at 74:9–25. Nahshon Webb was issued a desk appearance ticket for criminal possession of a controlled substance in the seventh degree. Ex. A at 55:12–24.

On March 21, 2018, Nahshon Webb's brother, Demali Coli, signed a letter stating that the oxycodone pill was prescribed to him, which he gave to his sister, Afiya Webb, for a toothache. Ex. G at 81:15–82:1; *See also*, Exhibit L, Dkt. Entry No. 71–11. During the search, Det. Hayes did not inquire whether the pill actually was prescribed to Demali Coli. Ex. A at 64:18–25. On

May 29, 2018, the charges against Nahshon Webb were dismissed and sealed. *See*, Exhibit M, Dkt. Entry No. 71–12.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). "A genuine factual dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Truitt v. Salisbury Bank & Tr. Co*., 52 F.4th 80, 85 (2d Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

If the moving party meets its initial burden of demonstrating the absence of genuine issues of material fact, "the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists." *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993). The nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Instead, the nonmoving party affirmatively must set out facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 250. "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"[W]here the nonmoving party bears the burden of proof as to a particular issue, the moving party may satisfy his burden under Rule 56 by demonstrating an absence of evidence to support an essential element of the nonmoving party's claim . . . . Where the moving party has attempted to demonstrate that the nonmoving party's evidence is insufficient as a matter of law to establish his claim, the burden shifts to the nonmoving party to come forward with persuasive evidence that his claim is not 'implausible.'" *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991).

## DISCUSSION

Plaintiffs claim that: (1) Defendants did not have probable cause to search the main house; (2) Defendants did not have probable cause to arrest Nahshon Webb; (3) Defendants did not have the authority to seize Plaintiffs during the search of their house; (4) Defendants maliciously prosecuted Nahshon Webb; and (5) Det. Hayes used excessive force on Kymani Duverney. *See generally*, Compl. Defendants argue that Det. Hayes is entitled to qualified immunity because there was probable cause as to the: (1) search of the home; (2) seizure of Plaintiffs during the search; (3) arrest of Nahshon Webb; and (4) prosecution of Nahshon Webb. Mot. at 14–27. Additionally, Defendants argue that they are entitled to summary judgment on the excessive force claim because there is no evidence showing Det. Hayes personally was involved when Kymani Duverney purportedly was flung to the ground. Mot. at 27–29. For the reasons set forth below, Defendants' motion for summary judgment is granted in its entirety.

### I. Qualified Immunity

Qualified immunity is "an immunity from suit rather than a mere defense to liability" that protects government officials "from liability for civil damages." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks

whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation. *Id.* (citation and quotation marks omitted). "A right is clearly established if [t]he contours of [the] right [are] sufficiently clear that every reasonable official would [have understood] that what he is doing violates the right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation and quotation marks omitted). Courts have discretion to decide which of the two prongs should be addressed first in light of the circumstances of the particular case at hand. *See*, *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

**A. Probable Cause**

Pursuant to New York law, the existence of probable cause is an absolute defense to false arrest, false imprisonment, and malicious prosecution. *See*, *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014). The existence of probable cause negates the existence of a Fourth Amendment violation. *See*, *Panetta v. Crowley*, 460 F.3d 388, 394–95 (2d Cir. 2006) (deciding first whether plaintiff had alleged a constitutional violation).

It is well established that an officer has probable cause for an arrest when the facts and circumstances leading up to an arrest lead an objectively reasonable police officer to conclude that either a crime has been committed or is in the process of being committed. *See*, *D.C. v. Wesby*, 583 U.S. 48, 56–57 (2018); *See also*, *Brinegar v. U.S.*, 338 U.S. 160, 175–76 (1949). The facts and circumstances must be viewed in their totality, not independently from each other. *See*, *Wesby*, 583 U.S. at 60. Additionally, police officers are "entitled to rely on the allegations of fellow police officers," and "information gleaned from informants can be sufficient to justify the existence of probable cause." *Panetta*, 460 F.3d at 395. The question is not whether the observations by others

were accurate, but whether it was reasonable for the arresting officer to rely on those observations, or if the circumstances raise doubts as to the person's veracity. *Id.* Moreover, "information provided by an identified bystander with no apparent motive to falsify has a peculiar likelihood of accuracy." *Id.* (citation and quotation marks omitted).

Defendants contend that Det. Hayes had probable cause to arrest Nahshon Webb and the search was executed pursuant to a validly issued and executed warrant. Mot. at 14–17. Plaintiffs counter that Det. Hayes did not have probable cause to arrest Nahshon Webb and did not have a valid warrant to search the house. Opp'n at 4. Specifically, Plaintiffs contend that Det. Hayes had made false statements and omitted information when he applied for the search warrant. *Id.* at 8. As this argument implicates the "corrected affidavit doctrine," the search warrant will be addressed *infra*. The Court will begin with whether Det. Hayes had probable cause to arrest Nahshon Webb.

Plaintiffs baldly contend that there was no oxycodone pill on the bedroom floor next to an empty prescription bottle. Det. Hayes' credible and admissible deposition testimony establishes the contrary. Det. Hayes testified that another officer informed him of an oxycodone pill lying on the floor of the bedroom and Det. Hayes recovered it. Ex. B at 70:22–71:11.

Plaintiffs do not provide any evidence that creates a genuine issue. In fact, Plaintiff Abena Morle admitted in her deposition that there was "one single prescription pill bottle" lying in the room and that she looked at it both before and after the incident. Ex. C at 73:1–16. A party does not create a genuine issue of material fact when there are no countervailing facts or evidence. *See*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"). Thus, there is no genuine issue of material fact that a prescription pill bottle was on the floor of the shared room, as recounted by Det. Hayes. Notably, Plaintiffs do not point to

any evidence contradicting the testimony that Det. Hayes was informed of the pill's existence by another officer or that Det. Hayes picked up the pill while executing the search warrant. As set forth above, officers are entitled to rely on the allegations and observations of fellow officers as reported to them so long as it is reasonable to do so. *See, Panetta*, 460 F.3d at 395. It is undisputed that Nahshon Webb slept in that room with other family members. Ex. B at 72:13–15; Ex. A at 56:15–24. Accordingly, these facts were sufficient to lead an objectively reasonable police officer to believe that a crime either was committed or was in the process of being committed.

Plaintiffs' additional contentions that the facts here do not establish the *mens rea* requirement that Nahshon Webb knowingly possessed the pill and that Det. Hayes could have determined the pill actually was prescribed to Damali Coley had he inquired further, are unavailing. Opp'n at 12–13. While officers generally need to provide *some* evidence of an accused's *mens rea*, they are given substantial leeway because of the "practical restraints on police in the field . . . with respect to ascertaining intent." *See, Zalaski v. City of Hartford,* 723 F.3d 382, 393 (2d Cir. 2013); *See also, Wesby*, 765 F.3d at 20 (Probable cause requires "at least some evidence" as to each element of the particular offense, "including the requisite mental state[.]"); *Ganek v. Leibowitz*, 874 F.3d 73, 86 (2nd Cir. 2017) ("The law has long recognized that probable cause does not demand evidence of every element of a crime—not even to support a person's arrest[,]" because of the "practical restraints in ascertaining knowledge and intent"). Nahshon Webb's admission that he slept in the room where officers discovered the oxycodone pill is sufficient to establish the *mens rea* requirement for possession.

It is unclear from the record whether Det. Hayes further investigated the ownership of the pill after he recovered it. Det. Hayes testified that Nahshon Webb told him the pill was his and that he had a prescription for oxycodone but could not produce a valid prescription for it. Ex. B at 73:5–16. Nahshon Webb, on the other hand, testified that no officer ever asked him about drugs

inside of the house. Ex. A at 64:15–17. In light of this contradictory evidence, the Court credits the non-moving party and assumes that Det. Hayes did not investigate who actually possessed the pill. However, it has long been established in this circuit that, once an officer has probable cause, he is "neither required nor allowed" to continue investigating. *Panetta*, 460 F.3d at 398 (citation omitted). While an officer may not disregard plainly exculpatory evidence, "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Id*. at 395–96 (citations and quotation marks omitted).

Here, Det. Hayes was not informed at the scene that the oxycodone was prescribed to Damali Coley or that Coley had given it to his sister Afiya Webb. Ex. B at 73:5–12. While Afiya Webb and Damali Coley may have known this at the time of the arrest, Afiya testified that "they [did not] ask me about it," and Nahshon testified that he saw Damali as he was being arrested and put in the van, but Det. Hayes did not speak with him. Ex. G at 81:2–7; Ex. A at 63:19–25. At that point, Det. Hayes had probable cause to arrest Nahshon Webb and was under no obligation to continue investigating who lawfully may have possessed the pill.

Lastly, even if Det. Hayes did not have probable cause to arrest Nahshon Webb, he still would be entitled to qualified immunity because his conduct was not unlawful pursuant to clearly established law. In this circuit, courts look to whether "arguable probable cause" existed at the time of the arrest to support qualified immunity. *Triolo v. Nassau Cnty.*, 24 F.4th 98, 108 (2d Cir. 2022) (citations omitted). Arguable probable cause exists if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (citation and quotation marks omitted). As discussed above, it was objectively reasonable for Det. Hayes to believe probable cause existed.

### B. Malicious Prosecution

Plaintiffs contend that Nahshon Webb was prosecuted maliciously because Det. Hayes did not have probable cause to arrest him. To prevail on a malicious prosecution claim pursuant to 1983, a plaintiff must show: (1) the commencement or continuation of a criminal proceeding against her; (2) the termination of the proceeding in her favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice. *See*, *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (citing *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003)). As discussed above, the existence of probable cause is a complete defense to false arrest and malicious prosecution claims. *See, Mara v. Rilling*, 921 F.3d 48, 73 (2d Cir. 2019).

While Defendants agree that a criminal proceeding commenced against Nahshon Webb was terminated in his favor, they contend that Det. Hayes had probable cause to arrest Nahshon Webb and that Plaintiffs have not presented any evidence showing that the proceeding was instituted with malice. Mot. at 13–14. The issuance of a desk appearance ticket constitutes the initiation of a criminal proceeding, which was terminated in Nahshon Webb's favor after it was dismissed on May 29, 2018. *See*, *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 199 (2d Cir. 2014); Ex. M, Dkt. Entry No. 71–12. However, while the Court has determined that Det. Hayes had probable cause to arrest Nahshon Webb, pursuant to New York law, the existence of probable cause at the time of the arrest can "dissipate" by the discovery of some intervening fact. *See*, *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), as amended (May 21, 1996). Thus, even though Det. Hayes had probable cause at the time of arrest, the Court must determine whether it had dissipated before Nahshon Webb was issued his desk appearance ticket. The record affirmatively answers that question in the negative and no genuine dispute exists otherwise.

Nahshon Webb testified that he was given his desk appearance ticket on August 4, 2017, the day he was arrested. *See*, Ex. A at 75:17–23. Demali Coli sent the letter stating the oxycodone

pill was prescribed to him on March 21, 2018, more than seven months after the criminal proceeding had been initiated. Ex. G at 81:15–82:1; *See also*, Ex. L, Dkt. Entry No. 71–11. As such, probable cause did not dissipate from the time Det. Hayes arrested Nahshon Webb to the time he was issued the ticket. Accordingly, Det. Hayes is entitled to qualified immunity as to the malicious prosecution claim.

Plaintiffs' malicious prosecution claim primarily relied on the lack of probable cause. *See*, Opp'n at 15–16. However, Plaintiffs also failed to muster any evidence whatsoever that the criminal proceeding was initiated out of malice. They contend that Nahshon Webb was arrested with malice because the police did not want to leave their search empty handed after "having conducted a fruitless search of plaintiffs' home." *Id*. Yet, Plaintiffs point to no evidence in the record in support of this theory. At most, family members, like Afiya Webb, testified that the police wanted to "pin" the oxycodone pill on Nahshon and did not speak to them about the prescription. Ex. G at 81:2–7. As discussed above, the police had no duty to inquire further once probable cause was established. Moreover, the evidence establishes that the police also found tramadol pills in the house and Kwasi Morle also was arrested. Ex. B at 74:20–75:13; Ex. A at 74:21–75:9. Thus, the search would not have been "fruitless" even without the oxycodone pill and Nahshon Webb's arrest.

### C. Corrected Affidavit Doctrine

Det. Hayes applied for and was granted a search warrant for the main house, while a different non-party officer obtained a search warrant for the detached garage or bungalows. Mot. at 11. The issuance of a search warrant, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that the search was supported by probable cause. *See*, *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)); *See also,*

*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("the fact that a neutral magistrate . . . issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner."). However, the validity of a search warrant can be challenged if a plaintiff shows that the warrant was procured through "deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof[,]" as mere conclusory allegations of falsehood are insufficient. *See, Franks v. Delaware*, 438 U.S. 154, 171 (1978). An officer violates an individual's right not to be arrested or prosecuted without probable cause when the officer "knowingly and intentionally, or with reckless disregard for the truth, made a false statement . . . or omitted material information, and that such false or omitted information was necessary to the finding of probable cause." *Martinez*, 115 F.3d at 115 (citing *Soares v. Connecticut*, 8 F.3d 917 (2d Cir. 1993)).

In order to make a determination as to whether an officer has made such a violation, courts apply the "corrected affidavits doctrine." Pursuant to this doctrine, courts "look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law. In performing this correcting process, [courts] examine all of the information the officers possessed when they applied for the arrest warrant." *Escalera*, 361 F.3d at 743–44 (citing *Martinez*, 115 F.3d at 115)). "If there remains an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted. Only if the corrected affidavit would not support a reasonable officer's belief that probable cause existed would the identified factual disputes be material to resolving the issue." *Id.* (citation and quotation marks omitted).

Plaintiffs argue that Det. Hayes misstated the confidential informant's testimony because the confidential informant did not tell the officers that any of the controlled buys occurred at

Plaintiffs' home. Opp'n at 8. Plaintiffs further contend that, because Det. Hayes was not present for two of the controlled buys, they could not be included in his application for a search warrant, and Det. Hayes failed to specify that there were two buildings, the main house and the bungalows or detached garage. *Id*. at 9.

Applying the corrected affidavit doctrine, the Court concludes that, if Det. Hayes had included all of the information available to him at the time of application for the search warrant, arguable probable cause still existed for the issuance of the search warrant. Plaintiffs erroneously contend that Det. Hayes cannot include information from the prior CI buys that he was not involved in. As discussed above, police officers are entitled to rely on the observations of fellow police officers. *See*, *Panetta*, 460 F.3d at 395. The analysis does not turn on whether the observations were accurate, but whether the officer was reasonable in relying on those observations. *Id*.

Det. Hayes was present for the last controlled buy, but not the prior ones. Ex. B at 16:17–17:2; 20:2–6. The prior controlled buys were handled by non-party officers who, subsequently, informed Det. Hayes as to what had occurred. *Id*. at 33:19–34:2. They told Det. Hayes that "JD Moosa then entered the house and the CI waited in the detached garage in the backyard of the location," and he understood "the house" to mean the multistory main house. *Id*. at 34:3–16; *See also*, 35:9–23 ("[CI] knocked on the front door of the location of the big house -- the main structure -- and was met by JD Moosa, who told them to go to the back to the second structure . . . which was a detached garage, told them to wait there. He closed the door [and] went back inside the main structure. A short time later[, he] left and went into the detached structure, the second one, and handed the CI one crack rock -- one loose crack rock [sic]."). Thus, the evidence before Det. Hayes was that the main house was used to store crack during the prior controlled buys.

Plaintiffs rely on the CI's testimony that the CI never purchased drugs from the main house, only the bungalows. Ex. 1 at 37:22–38:2. However, the CI also testified that the CI gave officers

specifics when the buys finished and said, "exactly what happened." *Id*. at 58:9–15. Additionally, the CI does not dispute that JD Moosa told the CI to wait inside the detached garage and "he closed the front door and remained in the house." *Id*. at 58:16–59:16. It is entirely plausible that the CI was referring to the two bungalows in the back when the CI talked about "the house" and not the multi-story main house, but "the actual accuracy or veracity of this statement is irrelevant to the determination" of whether Det. Hayes had probable cause. *See*, *Escalera*, 361 F.3d at 745. "Rather, the question is whether [the officer] could have reasonably relied on it." *Id*. In this case, there is no evidence that Det. Hayes relied unreasonably on what the non-party officers told him concerning the prior controlled buys.

Det. Hayes further testified that he could not remember seeing the third buy from his car, but that the CI told him that the CI entered the "main house." Ex. B at 28:21–29:5; 32:3–9. However, the CI testified that JD Moosa did not enter the main house during the third controlled buy. Ex. 1 at 30:2–31:5. Additionally, the affidavit does not specify that there are multiple properties at the Redfern address. The affidavit seeks a search warrant for a "private house" but describes the buys as having occurred at the "subject location" referring to the private house. *See*, Ex. 3, Affidavit for Search Warrant, Dkt. Entry No. 74–2.

In this case, a "corrected affidavit" would include the first two controlled buys in which Det. Hayes was told that the CI obtained illegal drugs from a JD Moosa who entered the main structure during said buys. Det. Hayes understood the main structure to mean the multi-story main house. He also would have had the CI's statements that illegal drug sales were occurring in the bungalows at the Redfern address. The corrected affidavit properly would specify the existence of multiple structures and that most of the illicit activity took place in the bungalows, and the third buy is excluded. Ultimately, officers of reasonable competence could disagree whether there was

probable cause to obtain a search warrant of the main house. Therefore, Det. Hayes is entitled to summary judgment on the basis of qualified immunity for the search warrant.

**D. Seizure of Persons Pursuant to a Search**

Both parties acknowledge that occupants of a premises may be detained during a lawful search. Opp'n at 17; *See also*, *Michigan v. Summers*, 452 U.S. 692, 705 (1981) ("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."). The Court already has concluded that arguable probable cause existed for the search warrant, as such, no constitutional violation occurred with respect to the seizure of persons therein for approximately two hours while the main house was being searched. Therefore, Det. Hayes is entitled to qualified immunity for the seizures of the occupants pursuant to the search.

**II. Excessive Force**

Plaintiff Kymani Duverney asserts an excessive force claim for being "flung" to the ground as police officers first entered the main home. Defendants contend that Det. Hayes, the only named Defendant in this case, was not personally involved in that altercation as the evidence affirmatively establishes that he began his search in the two bungalows and did not enter the main house until later. Mot. at 27. In response, Plaintiffs contend that none of the occupants could identify Det. Hayes, but that the officer who "flung" Kymani, or one of the other officers present when it occurred, could have been Det. Hayes. Opp'n at 20.

Personal involvement is a necessary prerequisite for a finding of liability in a 1983 case. *See*, *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); S*ee also*, *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

damages under § 1983.") (citations and quotation marks omitted). A defendant may be involved personally in a constitutional deprivation in several ways: (1) the defendant may have directly participated in the infraction, (2) a supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong, (3) a supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue, and (4) a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event. *See*, *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986). Additionally, "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir. 1988)).

Kymani testified that the police first busted into the house and one officer threw him on the ground and put a knee on his back while he was handcuffed. Ex. F at 42:71–5; 47:9–10. He further testified that about ten officers came in, all wearing "riot gear" with helmets and a shield covering their faces. *Id*. at 43:22–44:24. He described the officer that threw him down as "very tall . . . like six-four, six-three" and a "built" Caucasian male. *Id*. at 45:24–25. Det. Hayes testified that, on the day of the searches, most of the officers were in "plain clothes" but others were in riot gear. Ex. B at 60:5–15. Significantly, Det. Hayes stated he began his search in the bungalows first. *Id*. at 62:8–14. After searching the bungalows, he proceeded to the main house where some family members had been handcuffed and he addressed them collectively about the execution of the search warrant. *Id*. at 65:18–68:21. He further testified that he never handcuffed any of the occupants of the house. *Id*. at 69:13–18.

This evidence directly contradicts Plaintiffs' theory that Det. Hayes either personally threw Kymani to the ground or was present when it happened. There is no evidence in the record that creates a factual dispute with Det. Hayes' testimony. When asked if he knew what Det. Hayes looks like, Kymani simply stated "no." Ex. F at 65:18–22. Similarly, Plaintiffs Nahshon Webb, Abena Morle, and Afiya Webb testified that they do not know what Det. Hayes looks like or who he is. Ex. A at 125:1–11; Ex. C at 68:10–18; Ex. G at 87:9–22. Therefore, none of them can place Det. Hayes on the first floor of the main house when Kymani was thrown to the ground.

Plaintiffs argue that, because they do not know Det. Hayes, and the officers were wearing riot gear, it is plausible that he could have been one of the ten officers present when Kymani was thrown. Opp'n at 20. However, when a party moves for summary judgment and sets forth specific facts denying the claims, the opposing party must, "set forth specific facts showing that there is a genuine issue for trial." *See*, *Williams*, 781 F.2d at 323. "Mere conclusory allegations or denials will not suffice." *Id.* (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). It is not sufficient for Plaintiffs merely to state that Det. Hayes' sworn testimony is "conclusory and self-serving." They were required to put forth evidence showing a genuine issue for trial. As it stands, no reasonable juror could conclude that Det. Hayes was present at the time Kymani was thrown to the ground. Thus, Det. Hayes is entitled to summary judgment on the excessive force claim.[2]

[2] Despite having had ample time to conduct extensive discovery, Det. Hayes is the only named officer in this case. The record here establishes that a large officer, probably in riot gear, threw Kymani to the ground at the beginning of the search. There is no reason that Plaintiffs could not have uncovered the identity of the officer who could have been named as a defendant here.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted in its entirety and this action is dismissed with prejudice.

SO ORDERED.

Dated: Brooklyn, New York
October 20, 2026

/s/
DORA L. IRIZARRY
United States District Judge